Filed 8/14/26  In re S.S. CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.S., a Person Coming Under the Juvenile Court Law. | H053696 (Santa Clara County Super. Ct. No. 25JD028378) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. D.S. et al., Defendants and Appellants. | |

D.S. (mother) and S.S. (father) (jointly, parents) appeal from a juvenile court order following a contested six-month review hearing (Welf. & Inst. Code,[1] § 366.21, subd. (e)).  The court ordered continuing family reunification services and rejected parents' request that their child, 10-year-old S.S. (child), be returned to their care under a family maintenance plan.  The court also found that reasonable reunification services had been provided to parents.

---

[1] All further unspecified statutory references are to the Welfare and Institutions Code.

On appeal, parents contend there is no substantial evidence to support the finding that the Santa Clara County Department of Family and Children's Services (department) provided reasonable reunification services related to visitation. Parents assert that the department improperly permitted child to control visitation and placed the entire travel burden on parents after the department relocated child two hours away from the family's home in San Jose.

For the reasons explained below, we affirm the juvenile court's order.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Preremoval Background*

Child was born in August 2015. From birth to age seven, child lived with her first adoptive family. During that time, child "had attachment issues" and "hit her brother."

In December 2022, at age seven, child began living with mother and father. In February 2024, parents adopted child in Santa Clara County. She is parents' only child. During the adoption process, parents learned that child had been diagnosed with autism spectrum disorder, attention deficit hyperactivity disorder, disruptive mood dysregulation disorder, and oppositional defiant disorder.[2]

In late October 2024, the department received a report that mother had said " 'she wants to give [] child back.' " At that time, child had been suspended from school for "hitting and throwing chairs." When interviewed by a social worker, child "admitted to hitting her parents because her parents are mean and hit her too." Child added that "mother yells at her and it scares her." The parents denied hitting or yelling at child but reported that

_____

[2] The record indicates additional diagnoses of specific learning disorder and borderline low intellectual functioning.

2

child "has behaviors."  Mother "reported she is overwhelmed caring for" child.  The department concluded that the allegations of general neglect and physical abuse were unfounded and referred the family to supportive services.

In early November 2024, the department received a physical abuse referral concerning an allegation that mother had slapped child's face.  "The referral was evaluated out, as there were no reports of excessive force."

In early December 2024, the department received a report that parents had told the police that they "no longer wanted" child, "wanted her out of the home," and "could not control her behaviors."[3]  Child stated that "she no longer wanted to stay in the home" and mother "is always yelling at her."  Later, an emergency response social worker received a call from mother.  Mother reported that child was "destroying the home" and asked the social worker "to come get" child.  The social worker called "Immediate Stabilization Services," who responded to the home.

In mid-December 2024, the department received a report that mother had stated, in front of child, that mother no longer wanted child in the family's home.  Mother told a social worker that child had "outbursts and tantrums."  When the social worker suggested that mother try alternative methods for influencing child's behavior regarding schoolwork, mother responded, " 'I don't care, if you want to take her and do it then you guys can but we are her parents and she must listen to us.'  [Mother] also stated she was done and no longer wants to deal with [child's] behaviors."  The department concluded that the emotional abuse allegation concerning mother

---

[3] Father later "denied wanting to give [child] back.  He stated that he and [mother] needed help as [child] has become more defiant."

was inconclusive and the caretaker absence/incapacity allegation was unfounded. The department referred the family to supportive services.

On January 7, 2025,[4] the department received a report that mother had slapped child's face, and father had pulled child's hair and thrown shoes at child when she refused to get out of bed to go to school. Child relayed that mother had hit child with a metal pole as she lay in bed and father had "pulled [child] by the ear, threw her out of the home, threw her shoes at her, and told her to go to school." Parents denied hitting child, and child "had no visible marks, bruises, or hair coming out." The department concluded that the physical abuse allegation was unfounded.

B. *Removal*

Later that same day (on the night of January 7), parents called 911 and mother stated that parents were going to "kill" child if she was not taken from their home. San Jose police officers and a social worker responded to the home. Mother told an officer that mother did not mean what she had said about wanting to kill child. Mother reported being overwhelmed by child's use of "bad words" including a newly learned word, " 'motherfucker.' " Father, likewise, relayed that child "used profanity and talked back."

Child told the police that mother had hit child on the arm and grabbed her neck. Child added that she did not want to live at the family home. Mother admitted to officers that she had hit child on the arm with an open hand and grabbed child by the back of her neck. Father stated that he is "overwhelmed," "does not want to take care of [child,] and [child] told him that she no longer wanted to be home." An officer observed that child's bedroom was empty except for a mattress, boxspring, and plastic container

---

[4] Unless otherwise indicated, all dates were in 2025.

holding child's clothing. "No visible injuries were found and [child] did not complain of pain. She refused medical attention."

When speaking to the responding social worker, parents "were adamant" that child needed to leave the family's home and "they could no longer handle the behaviors." Mother said, " 'I hit her, and if you do not take her I will hit her more. I cannot take it anymore.' " "The mother and the father reported, '[child] cannot come back here.' " Child reiterated to the social worker that "she did not want to go home," but child would not answer the social worker's questions about the reasons for child's desire. Child also "admitted to hitting her parents, but she would not disclose if her parents had hit her that night."

The police took child into protective custody, and on January 8, the social worker brought child to "The Welcoming Center." There, child told a social worker that it was " 'bad' at home. When asked why it was bad, [child] said she did not know. She added that she liked her house because that was where her mother and father are." Child explained that the rules at home are that "she had to be nice" and "listen to her parents." When she "got in trouble," parents would take away her phone for the day. In response to a question about communication with her parents, child "stated that she could not return to her home. She added that her parents told her that she could not return to the family's home."

Parents met with social workers on January 8. Parents "stated that they were frustrated with [child]'s behaviors of using profane language and giving them the middle finger." Father reported that child "had an addiction to screen time on the phone or television." Parents limited child's screen time to "about 30 minutes [three to four] times a day." "The parents stated that when the phone was not given to [child], she would break things and tell her

parents to 'shut up.' [Mother] also noted that [child] had told her that she hated her and blamed her for taking her from her family." Mother "stated that she had [] previously called law enforcement [three to four] times and that each time, [child] heard her call them."

Regarding the incident on the night of January 7, mother explained that child had asked for her phone, but mother suggested child "do other activities." Later, when child did not want to go to bed, mother threatened to take away child's phone privileges for the next day. Child responded by "using profanity towards" mother. Mother admitted to hitting child's arm and grabbing her neck. In response, child "broke the window blinds" and "threatened to break everything" and "burn" mother. Father shared that parents do not have any family members that live nearby who can help them care for child.

On January 9, a social worker offered child a video call with parents, but child declined saying she did not want to speak with them.

On January 10, the department filed a juvenile dependency petition under section 300, subdivisions (b)(1) and (g) (petition). The petition alleged: (1) child was placed into protective custody because parents could no longer provide for child's safety in the home; (2) on January 7, mother called the police because she was overwhelmed with the care of child and requested that child be removed from the family home; (3) parents had made similar removal requests in October, November, and December 2024; (4) on January 7, mother hit child and grabbed the child's neck in anger and stated to a responding social worker, " 'I hit her, and if you do not take her I will hit her more. I cannot take it anymore.' "; (5) mother's inability to appropriately manage child's behaviors, despite the support of community and school services, places child at substantial risk of harm in mother's care; (6) child

6

has been left without any provision for support, in that parents will not provide care for child and are adamant that she leave their home; and (7) "[n]either parent has identified or arranged for an alternative caretaker for the child."

On January 13, the juvenile court held a hearing on the petition. Parents attended the hearing and asked the court to release child back to their care. Parents expressed regret about the incident that led to child's placement in protective custody and said that they wanted to reunite with child. Child's counsel objected to parents' request explaining, inter alia, that child is "afraid to" and "does not want to go home." Counsel added that during a visit prior to the hearing, mother repeatedly questioned child about why she did not want to return home, which was very upsetting to child. The department and child's counsel asked the court to caution parents not to discuss the case with child. The court ordered child's continued detention and admonished parents not to discuss the case with child during visitation. The court also ordered that parents be provided supervised visits at a minimum of two hours, two times per week.

On January 15, child declined an in-person visit with parents. The next day, child declined a video visit with parents. On January 22, child declined an in-person visit with mother but agreed to visit with father. During that visit, father asked child if she wanted to see mother. After child said she did, mother joined the visit. Later, child told a social worker that child was "sad." When the social worker raised the prospect of another family visit later that week, child "said she only wanted visits with her parents once a week." Two days later (on January 24), child declined an in-person visit with parents (saying she was "scared") but agreed to a video visit.

7

C. *Jurisdiction and Disposition*

On February 3, the juvenile court held a jurisdiction and disposition hearing. At the hearing, the court sustained the petition, judged child (age nine) a dependent, removed her from the care of parents, and ordered family reunification services as recommended by the department. The reunification case plan included a parent orientation class, a class on parenting children with special needs, a class on parenting without violence, counseling or psychotherapy to address child's trauma and attachment issues, and parent-child interaction therapy. The court ordered a minimum of twice weekly supervised visits between child and parents. The court also directed, inter alia, that the "social worker has discretion to select the location and supervisor of the visits." The court set the six-month review hearing for July 28.

D. *Provision of Services to Child and Parents*

In a status review report filed on July 21 (report), the assigned social worker, Yvonne Ruano, summarized child's status as follows: "During this reporting period [from February 3 to July 19], [child] experienced three different failed placements and a significant number of psychiatric holds, due to aggressive behaviors toward herself and others, as well as suicidal ideation and threats to harm others. Throughout this reporting period, her behavior has progressively worsened. On [July 19], child transitioned to a new placement, a [s]mall [f]amily [h]ome, in Folsom, CA."

The report relayed that, during the reporting period, child: (1) "continued taking psychotropic medication to address her aggression, irritability, impulsivity, and hyperactivity"; (2) had an intake appointment

8

(on June 25) with a regional center;[5] (3) "had several [individualized education program] meetings to discuss her progress, concerns, annual assessment, and suspensions"; (4) "received extensive therapeutic services," but "her instability and dysregulation [] appeared to increase throughout the reporting period"; and (5) "was placed on 12 psychiatric holds at the [crisis stabilization unit] and [had] one 10-day psychiatric hospitalization."

Regarding child's placements, the report explained that child had resided at The Welcoming Center from January 8 through February 10. Child next moved to a foster home in San Jose. There, child "demonstrated significant behaviors, including threatening to kill the foster mother with a knife, running away from the foster mother in a parking lot and toward the street, as well as physically aggressive behaviors."

Following a psychiatric hold and another stay at The Welcoming Center, on March 17, child was placed in a different foster home in San Jose that "is a specialized therapeutic placement designed to provide enhanced support for youth with complex behavioral, emotional, or medical needs, with a goal of stabilizing these youth in a home setting." Within one day of placement, child exhibited "physical aggression," "dysregulation and escalations of her behavior."

Following a psychiatric hold, a 12-hour stay back at the foster home, and another psychiatric hold, child was hospitalized for 10 days (from March 24 to April 4). Thereafter, child returned to the foster home "but her behavior continued to escalate." Following another psychiatric hold, child returned to The Welcoming Center on April 14.

---

[5] During this appointment, child "took her mother's purse from her and rummaged through it, threw a pen and a cup of water on [mother], and hit and punched her."

9

On May 21, child was placed in a "Placement Support Services (PSS)" home "with a [p]rofessional [p]arent." "After less than 12 hours of being placed at the PSS home, [child] got into a highly escalated incident with the foster parent." Following a psychiatric hold and a one-day stay back at the PSS home, the foster parent "gave an immediate notice" terminating the relationship, and child was returned to The Welcoming Center. There, child "occupied the space of three beds, allowing that same number of staff (enough for three youth) to support [child]'s significant needs."

On May 22, during a medication management appointment with child's psychiatrists and therapist, mother "became extremely angry and was yelling at the doctors and [] social worker [Ruano], stating that no one keeps her updated on how [child] is doing. She added that [child] needs a 'very, very, very experienced therapist.' [Ruano] informed [mother] that she is provided with updates on [child] as soon as [Ruano] is reasonably able to do so, which is almost always within 24 hours."

On June 24, parents met with Ruano and a supervising social worker to discuss child's impending placement out-of-county. According to the report, "Neither parent was happy, and though this was understandable, their response of both becoming escalated and yelling at [the social workers] was not. Both parents were very escalated, and on her way out of the room, [mother] stated, 'she isn't even my child.' "[6]

---

[6] In a letter filed with the juvenile court on July 25 (letter), mother disputed the report's recounting of mother's statement. Mother wrote, "What I said was 'She is not my child anymore' meaning that [child] is the [c]ourt's child and I am not able to take care of [child] as I see fit and I have no say about where she will be staying and what she will be doing etc. I was not expressing that I love her any less as an adoptive child. I believe my actions show directly the opposite."

On July 3, child's psychiatrists told mother that their outpatient clinic could not provide child "the level of care [child] would benefit from, and that typically, children with the symptoms that [child] presents, with stabilization not yet being achieved, require a residential setting." Mother "was not in agreement and stated that she wanted medication management to continue with [the clinic]." At the next appointment (on July 17), a psychiatrist reiterated that the clinic could not continue providing psychiatric services to child given her care needs and impending move to Sacramento County.

As mentioned *ante*, on July 19, child was placed at a small family home in Folsom. During the three weeks preceding this placement, child was "adamant about wanting to leave [The Welcoming Center] and move into the [small family home]. She [] experienced a lot of anxiety, as well as excitement, about moving." The report explained that this is a "temporary placement, with a six-month plan, which can be extended an additional six months if necessary." The report added: "Due to [child]'s significant needs, the focus will remain on stabilizing [child] in a more restrictive and temporary placement with the hope that she can meaningfully engage in visitation with her parents and a return to there i[f] possible, or [s]he is ready for another alternative home that can meet her needs while also offering her permanency."

Regarding the classes identified in the reunification case plan, the report noted that mother had completed the parent orientation and special needs parenting classes and enrolled in the parenting without violence class.[7]

---

[7] The department subsequently notified the juvenile court that mother had completed the parenting without violence class.

Father completed all the identified classes. In addition, mother and father attended multiple individual therapy sessions during the reporting period.[8]

In the report, Ruano expressed concern that notwithstanding mother's attendance at parenting classes, mother continued to exhibit "dysregulation and escalation [that] has negatively impacted services, including visitation with [child]." Ruano explained that at a family therapy session on July 8, mother "became escalated in front of [child], which scared [child], and she attempted to go after [child] as she was leaving the session due to being scared by [mother's] actions." Ruano added, "There have been several other occasions where [mother] is unable to control her emotions or manage her anger and she has yelled at this social worker and other providers, as well as at [child] via telephone."

The report acknowledged that the court-ordered parent-child interaction therapy "was not offered to the family" because, inter alia, child was beyond the eligibility age and not visiting regularly with parents. Instead, "[t]herapeutic [v]isitation" was offered to child and parents. An initial therapeutic visit was scheduled for April 29. That visit, however, did not occur due to "some miscommunication with the visitation program" and child's refusal to visit. Mother responded to these circumstances by becoming

---

[8] In a letter filed with the juvenile court on August 28, father's therapist wrote: "During our work together, [father] has shown meaningful insight into the factors that contributed to system involvement. He has responded to feedback with accountability and demonstrated a deepening understanding of their child's emotional needs, particularly as it pertains to repairing and strengthening the parent-child attachment." The therapist further opined that father "presents a low risk to [child] if provided with continued support and oversight through a [f]amily [m]aintenance plan. Reunification at this stage—with intensive in-home services and therapeutic support—would serve the best interests of the child by preserving their primary attachment and minimizing further trauma."

"very upset" and "highly reactive, yelling at [] social worker [Ruano] and the visitation program staff." Mother "insisted" that Ruano "inform [child] that, 'If you don't go to the visit today, your parents will not visit again.'" Parents additionally "expressed frustration of [child] being allowed not to attend visits and expressed that the visits should be forced."[9]

The first therapeutic visit occurred on May 6, but child attended for only "a few minutes." Thereafter, child "refused to attend several therapeutic visits, but she also attended many." Child's therapeutic team "attempted to encourage and motivate [child] to attend" the visits. For example, The Welcoming Center staff "incentivized" child to attend with the promise of a meal from a restaurant of her choice. When child failed to attend a scheduled therapeutic visit, parents "consistently" met with the therapist for "parent sessions."

When child attended the therapeutic visits, she usually participated for "five to [10] minutes," but "there were a couple of therapeutic visits" that she attended for "about 30 minutes." The report added, "Unfortunately, [child] has become physically aggressive toward her parents during some of the therapeutic visits. [Mother] requested that support [staff] not intervene during those instances to allow her to respond; however, support [staff] or [the therapist] have had to intervene at various times." The report described

---

[9] Regarding forced visitation, the report states: "To be clear, it is the [d]epartment's position that forcing [child] to have visits with her parents, who caused her serious trauma, which exacerbated the impact of the disruptions in her attachments, would be additionally traumatizing for [child] and contrary to reunification efforts. Further, there are other, better ways to support [child] in participating in visits, which first require [child] building emotional safety. Further, ideas and plans to support [child] in visiting her parents were discussed across time with her mental health treatment team in biweekly provider meetings as well as in [child and family team meetings] and monthly contact with [child] and her parents."

two incidents (on June 10 and July 8) during which child's behavior "escalated."

At the July 8 therapeutic visit, child asked to leave the visit. As staff were escorting child out of the visit, mother " 'pushed past [the therapist],' telling [child], 'I need you to hear this, no one else will tell you his. I need you to come home.' " In addition, mother " 'kept swatting at [the therapist] to get [her] out of the way,' and [the therapist] had to 'evade' when [mother] tried to 'push past her again.' " After child left the visit, mother "began 'screaming in [therapist's] face, saying things like, "you need to call her! You need to let me talk to her!" ' " The report indicates that father was " 'not really engaged' " during this incident.

The next day, child "explained to [The Welcoming Center] staff that 'this is why she doesn't want to return to her parents' home after being followed and yelled at on the way out by mom that she is coming home. [Child] was truly scared and rushed to the car with staff. She continued to be scared that mom might be following her to [The Welcoming Center] during the ride back. She woke up this morning feeling afraid that mom would show up at [The Welcoming Center] to take her home.' "

In her letter to the juvenile court, mother denied any "physical aggression towards [child] or staff" at the July 8 therapeutic visit. Mother stated that the therapist "was physically restraining [mother] to prevent [her] from getting closer to [child]." Mother also denied yelling "at other staff members or [child]." Mother explained: "I did not realize that [child] would be scared by calling out to her and profusely apologized to [child] in the very next opportunity. The reason I called out to her was because in the [p]arenting [w]ithout [v]iolence [c]ourse that I recently graduated from, I was told to 'give your child a sense of belonging,' so I thought it was important for

14

her to hear that 'she has a home and she has to come back home.' I am open to further coaching and training to better communicate with [child]."

Additionally, mother wrote in her letter that on July 11, child called mother "in the presence of [a] [c]linician from [The Welcoming Center] without any prompts from anyone and stated that she 'wanted to check-in on her parents.' " The call lasted for "around 23 minutes" and child spoke with mother, father, and "even [child's] grandma."[10] Mother also wrote that child attended a visit on July 15, "without any prompt or any incentive. When [parents] left the very crowded visit with [three] supports and the therapist, [child] was looking from the window and after the parents left, when staff had asked her if she wanted her parents to come back, she replied 'Yes.' " Mother further noted that child "ha[d] been coming to visits regularly for [seven] weeks (from June 3rd to July 15th) with [] [four] of those visits lasting on an average close to 30 minutes."

The report explained that further therapeutic visitation "will be explored once [child] is able to be connected to mental health services in her new [c]ounty of residence." The report added: "Once the [d]epartment receives approval of the presumptive transfer of mental health services for [child], the [d]epartment will attempt to identify visitation centers in Sacramento County for [child] and her parents to visit, due to her behavior struggles, and particularly during long car rides, and the need for therapeutic support during visits, which [child] cannot receive in Santa Clara County."

---

[10] At the subsequent six-month review hearing, social worker Ruano testified that child's call to mother "wasn't unprompted." Rather, a therapist asked child if she wanted to call her parents, in accordance with the therapist's usual practice of asking child at the beginning of every therapy session whether she would like to call her parents.

15

Relatedly, in an addendum report filed on August 26 (addendum report), social worker Ruano stated that child's "wraparound services through Seneca Family of Agencies in Santa Clara County officially ended on [August 18]," and child "is not currently receiving mental health services." The department was in the process of "connecting [child] to mental health services in Sacramento County," with an expectation that child "will be connected to wraparound services with Stanford Sierra Youth & Families [] and can begin receiving the therapeutic support she needs."

Regarding visitation, the report acknowledged that "visitations have not been occurring as [c]ourt-ordered." The report relayed that child had participated in a "virtual call" with parents on February 7. The call "went well," and "[a]t one point[, child] used a filter and wrote 'I love you' to her parents and asked if they liked it." On February 11, 13, and 20, child visited in-person with father "while her mother appeared by Facetime" due to her travel abroad. On March 4, child attended an in-person visit with parents but asked to leave "[l]ess than 15 minutes after the visit began." Mother "attempted to continue engaging [child], but [child] insisted on ending the visit."

After the March 4 visit, child "refused to attend other visits, until the therapeutic visits began [on May 6]. [Child] was encouraged and motivated by her placement, therapeutic teams, and [] social worker [Ruano] to visit with her parents, but despite those efforts, [child] refused. She was also placed on psychiatric holds . . . or [hospitalized] during some of the visits, which did not allow the typical visits. [Child] was offered to call or Facetime her parents while on psychiatric holds, but many of those times, she refused. Throughout this reporting period, [child] was asked or encouraged to call her parents, and if she wanted to, she was given the opportunity to do so. There

16

were a few times during this reporting period that [child] agreed to call her parents. For the most part, the calls were brief. In the more recent calls, it appears that [child] called her parents to yell at them or tell them that she was not going back to their home."

Because visitation was inconsistent and infrequent, parents "were encouraged to utilize other forms of communication, such as letter writing and journaling, which they did in their therapeutic visits turned parent education sessions when [child] declined to attend." Parents' letters "were appropriate and included small drawings, such as rainbows, for [child]."

On July 10, at a child and family team meeting, parents "reported that they would not travel to visit with [child], due to the distance and time it would take for them to travel to Sacramento County, and that it is the responsibility of the [d]epartment to find a way for [child] to arrive to visits in San Jose. When [] social worker [Ruano] expressed concern that the parents would ask [child] to do the time and travel they themselves did not want to do, knowing the impact this would have on her, and their visits, they both continued to report that they would not be visiting [child] in Sacramento County." Parents "remained adamant" about not traveling to see child even after Ruano expressed concern about child's mental health struggles, "struggles during car rides," and "difficulty being motivated and feeling safe in attending her visits with them."

Child's last in-person visit with parents took place on July 15.

Regarding child's placement in Folsom on July 19, the addendum report relayed that child was "thriving in the home and has established some stability that she had not yet demonstrated since being removed from her parents' care."

17

In early August, child began attending school (described as a special day class counseling enriched program). On August 18, child was suspended for two days "due to physical and verbal aggression, which included throwing objects, flipping over tables, and physically assaulting staff and peers."

After child moved to Folsom, child's therapist offered twice weekly video visits between child and parents, but child "often declined the offers to call her parents." At the beginning of each therapy session, child's therapist would ask about child's willingness to call parents and attempt to encourage child to call if child declined to do so. During a video call on August 1, child " 'was out of camera and ignored the parents for the majority of the visit.' " When therapist encouraged child to talk to parents, child "refused and became more escalated."

On August 18, Ruano visited child at her placement. Ruano read and provided child letters from mother and father. Ruano "explained to [child] that her parents love and miss her and would like to visit her in person." Child said she would be open to visiting with her parents soon, but child declined Ruano's repeated offers to "Facetime her parents" during the meeting. Child, however, agreed to have a call with parents the following week, on child's birthday. Ruano explained to child that upon her reconnection to therapeutic services, Ruano would work on setting up in-person therapeutic visits. Ruano also planned to schedule "virtual visits, twice a week, which [she would] supervise, until the therapeutic team is in place and is able to supervise visits." Additionally, child's small family home caregiver "agreed to encourage [child] to be open-minded to visits with her parents and to encourage [child] to attend the virtual visits."

For the six-month review hearing, the department recommended that the parents be provided with an additional six months of reunification

services.  Ruano explained that although parents "love their daughter and would like for her to reunify with them, [] they struggle to understand how her trauma and lived experiences, complicated by her mental health and behavioral challenges, not only impact her ability to establish stability, but in turn have an impact on the reunification process.  The parents' inability to fully understand and incorporate their newly acquired knowledge and skills as parents of a child with special needs also hinders their ability to have realistic expectations of their own current abilities to fully address [child]'s current needs."  Ruano further noted her concern that parents "struggle to work collaboratively with service providers who support, encourage, and motivate [child]."  Ruano added that parents' "inability to self-regulate and control their emotions and anger have had a negative impact on the work they have done thus far."

E. *Six-month Review Hearing*

At a July 28 court proceeding, mother and father objected to the department's recommendation of continued family reunification services.  Additionally, mother's counsel asked the juvenile court to "mandate virtual visits a minimum of twice a week for the next three weeks" and order in-person visitation "starting on August 19th," "at a location that's mid-distance between Santa Clara and Sacramento County."  The court ruled that its prior visitation orders would remain in effect.  The court added that it was "leaving it to the discretion of the social worker."  The court scheduled a contested six-month review hearing for September 3.

At the contested hearing, the juvenile court deemed social worker Ruano an expert in risk assessment for juvenile dependency cases.  The department submitted the matter on Ruano's reports, subject to cross-

examination. Mother and father testified on their own behalf and entered exhibits into evidence.

a. Social Worker Ruano's Testimony

Under cross-examination by mother's counsel, social worker Ruano acknowledged that mother had an unscheduled visit with child at her school around April 16, during which mother acted appropriately and dropped off a toy and card to child. Ruano also acknowledged that during a "providers meeting" in mid-June, the participants noted that child's visits with her parents " 'have been more positive' " and child was " 'able to be redirected and stay [at the visits] for longer periods of time.' "

Regarding child's behavior during car rides, Ruano confirmed that on July 1, staff from Seneca Family of Agencies and The Welcoming Center drove child to the then-potential placement in Folsom for a visit. Ruano acknowledged that a staff member had reported child did well during the drive. Ruano added that "[t]here was three staff to distract" child on this trip and that on one of child's trips to Folsom, "they had to make a lot of stops."

On September 2, during a phone call between child and parents, parents raised the prospect of seeing child again. Child responded by asking if it would be at home. When parents said, " 'If you want it to,' " child responded " 'No' " and said "she's nervous." That same day, child had "an escalation at school." The principal reported, " 'There were moments of yelling about how much she hated her life and wanted to go back to San Jose.' "

Ruano acknowledged the existence of several reports documenting child's statements suggesting low self-esteem, suicidal ideation, and dislike of her present circumstances.

20

Under questioning by child's counsel, Ruano opined that child "is scared of her parents. She's scared of everything. She's had bad experiences everywhere. She just doesn't feel stable until [*sic*] where she's at right now." Ruano added that during child's time in the small family home in Folsom, child has had "a significant decrease" in concerning behaviors.

Under questioning by the department's counsel, Ruano explained that child's stability in her current placement "will help with reunification," because child "has been able to withstand [three virtual] visits with her parents" and has exhibited greater stability in school. Ruano added, "Prior to this placement, [child] was having at least two incidents a day at school and in her placement. And to have two incidents in six weeks overall is showing stability in her improving."

Under questioning by father's counsel, Ruano testified that the longest of the three recent virtual visits was 20 minutes, and the aggregate visit time was not more than one hour.[11]

### b. Mother's Testimony

Mother testified that child's concerning behaviors started a day or two after she joined their family in December 2022. The behaviors included "hitting, slamming doors, throwing things at [parents], screaming, yelling, stomping her feet, . . . physically trying to bite anybody who tries to stop her," and "digging her nails on the skin." In October 2024, "the main thing that was bothering [parents] was . . . this usual scream. Like, whenever the timer goes off, [child] would be just mad and don't want [*sic*] to stop the TV." Child also began exhibiting "verbal aggression, which she learned from school. And

---

[11] In rebuttal testimony, Ruano explained that most of child's earlier in-person visits "were about [five] minutes, maybe 10," and two "were 30 minutes."

21

it was, like, every single day." Mother "initially would react, and [she] shouted at [child,] 'Stop. Don't say this.' And [child] would not listen, and she would keep doing the same things." Mother began "ignoring . . . all the F words. But on the 7th of January, [child] said something that she didn't say before. And it was the first time [mother] was hearing [this] from her. [Mother] was shocked." Mother added that she was "overwhelmed by all the things" that happened on January 7.

Before child was removed from the family's home, parents worked with a therapist and child's psychiatrists for medication management. In addition, parents took a parenting class and instituted a "reward chart system" for child which "seemed to work for some time." After child's removal, mother developed "a better understanding of [child's] trauma" and presently "see[s] that [child's] behaviors are because of th[at] trauma and not directly . . . targeting" parents. When parents initially took child into their home, mother did not expect that child would behave as she did. Child's behaviors became overwhelming and, within the first six months, mother "called the [adoption] agency a few times and asked them, . . . what can I do?" The agency suggested that parents return child to her first adoptive family. Upon learning that the first adoptive family would not take child back and child would end up at a group home, parents "decided we are not going to return her and we will try on our own and help her."

Mother testified that after child's removal, mother never told child that mother was going to give up on child. Rather, mother "always said, 'I love you. I miss you. I want you to come back home.'" Consistent with her letter to the juvenile court, mother denied making the statement " 'She isn't even my child.' " Mother also denied having "responded angrily" toward child since her removal. Mother explained that "wraparound service was useful"

22

and mother has been practicing "validating [child]'s feelings and also giving her a sense of belonging to the family." Mother believed that she "should be able to handle [child's] behaviors" presently given the support the family is receiving and all that mother has learned.

Mother did not miss any scheduled visits, and child had attended their last seven visits (through July 15), sometimes without any prompting or incentives. Before child's placement in Sacramento County, "[v]isits were going well." After child moved to Folsom, there were no further therapeutic visits.

Mother explained that she does not believe the juvenile court should force child to return home, "but they should guide her . . . to what is . . . for her best long-term interest. And for her best long-term interest, returning to her family right now is [the] best option for her." Mother believed that "right now [child] needs the stable and loving environment with her family to heal from her trauma. Not in isolation, but together with her parents." Mother expressed her concern about child's low self-esteem and weight gain.

Mother denied swatting at the therapist during the July 8 therapeutic visit and noted that the therapist and other "Wrap team" members later sent parents a card that included supportive messages.

c. Father's Testimony

Father testified that child preferred "watching TV or screen time" over other activities (such as academics) and parents "had challenges when transitioning [child] from preferred to nonpreferred" activities. In addition, child "understood what [made father] upset or angry," which included turning switches on and off very rapidly, breaking "the barriers of the stairs," and "banging on [their] door."

Since child's removal from the home, father's therapist has helped him to cope with the sorrow and "build back the trust and the relationship." Father has learned that child's behaviors are due to her trauma and "not actually directed towards [him] in particular." He also learned from the class on parenting without violence that he "need[s] to be a coach and not a policeman" to child and, from the " 'parenting for special needs' class," how to "be a good emotional support" to child. Father explained that when child "is regulated, she is a very sweet and smart kid." Father has learned to "step back, take a deep breath, and compose [him]self" when child becomes upset.

After child was placed in Sacramento County, parents had several virtual visits with child but no in-person visits. The virtual visits were, in general, "good." Father expressed his concern that child's current placement amounts to another traumatic detachment in child's life and is not properly addressing child's "addiction towards the screen time." Father explained that "excessive screen time is very harmful for kids with ADHD."[12] Father also expressed parents' further concern about child's academics and behavior at school.

Father asked the juvenile court to return child to parents' care under a family maintenance plan. Father stated that he is confident parents could handle child upon her return to the family.[13]

---

[12] In rebuttal testimony, social worker Ruano testified that although child has been provided a tablet, she "is not having unlimited screen time" and "has to have earned it."

[13] Following the presentation of evidence, counsel for the parties made closing arguments to the juvenile court.

d. Juvenile Court's Ruling

On September 11, the juvenile court issued its decision on the six-month review hearing and parents' request that child be returned to their care under a family maintenance plan.

The juvenile court found that the department had met its burden to show, by a preponderance of the evidence, that there would be a substantial risk of detriment to child's safety, protection, or physical or emotional well-being if she were returned to the care of parents.

The juvenile court recognized that parents love child, "have some recognition of their behaviors that impact [child,] and acknowledge [child]'s trauma." The court explained that child's trauma "is abundantly clear." The court added, "it's abundantly clear as well that [child] is not yet ready to return home." The court noted that child "has expressed some of her preferences [in this regard] through verbal and non-verbal communications over the last few months."

The juvenile court further observed that child had often refused to attend visits with parents. The court found "[t]he evidence is clear that [child]'s emotional needs are such that she is barely, if as yet, ready to visit her parents, certainly not, as yet, ready to return to their care." The court added it "is not convinced that [parents] have, as yet, demonstrated that they're able to implement what they have learned in a practical way. And this, again, is complicated by [child]'s complex needs."

The juvenile court found, by clear and convincing evidence, that the department had provided reasonable reunification services to parents (reunification services finding).

The juvenile court continued family reunification services for parents and set a 12-month review hearing in January 2026.

25

Mother and father appealed from the juvenile court's ruling.

## II.  DISCUSSION

Mother contends there is no substantial evidence supporting the juvenile court's reunification services finding as it relates to visitation. Mother asks this court to "reverse the six-month review finding that reasonable services were offered or provided and remand with directions to provide an additional period of reunification."  Father joins mother's claim in full (without stating any further argument).

The department responds that parents forfeited their current claim of error by not raising it in the juvenile court.  The department further contends that regardless of forfeiture, substantial evidence supports the court's finding that the department provided parents with reasonable reunification services.

A. *Legal Principles*

When child is removed from a parent's custody during a dependency proceeding, the juvenile court is generally required to order the department to provide reunification services to the child and parent.  (§ 361.5, subd. (a).) If the child is three years old or older at the time of the initial removal, the parent and child are entitled to 12 months of reunification services.  (*Id.*, subd. (a)(1)(A).)

The juvenile court is required to hold periodic status review hearings, including at six and 12 months after the dispositional hearing.  (§ 366, subd. (a)(1).)  At the six-month review hearing, "[i]f the child is not returned to their parent or legal guardian, the court shall determine by clear and convincing evidence whether reasonable services that were designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or

26

offered to the parent or legal guardian." (§ 366.21, subd. (e)(8); see also Cal. Rules of Court, rules 5.708(d)(1), 5.710.)

" 'Visitation is a critical component, probably the most critical component, of a reunification plan.' [Citation.] 'Without visitation of some sort, it is virtually impossible for a parent to achieve reunification.' " (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 673 (*Serena M.*).) " 'The absence of visitation will not only prejudice a parent's interests at a [review] hearing but may "virtually assure[] the erosion (and termination) of any meaningful relationship' between [parent] and child.' " (*Ibid.*) Generally, the department is required to make reasonable efforts to ensure visits occur and to encourage a child to visit their parent. (See *In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1047 (*Sofia M.*); see also *Serena M.*, at p. 673.)

" 'Where the minor is reluctant to visit, and family therapy is needed to promote visitation, such therapy may be critical to reunification.' [Citation.] 'But a parent's liberty interest in the care, custody and companionship of children cannot be maintained at the expense of their well-being.' [Citation.] 'While visitation is a key element of reunification, the court must focus on the best interests of the children "and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300." ' [Citation.] 'This includes the "possibility of adverse psychological consequences of an unwanted visit between mother and child." ' " (*In re A.O.* (2025) 111 Cal.App.5th 1048, 1062 (*A.O.*); see also *Serena M., supra,* 52 Cal.App.5th at p. 673 ["the juvenile court may deny visitation by finding that forced contact with a parent is harmful to the child"]; *In re S.H.* (2003) 111 Cal.App.4th 310, 317 [explaining that the juvenile courts must "ensure regular parent-child visitation occurs while at

27

the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances"]; § 362.1, subd. (a)(1)(A).)

B. *Standard of Review*

" 'When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence.' [Citation.] 'In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof.' [Citation.] 'The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case.' " (*A.O.*, *supra*, 111 Cal.App.5th at pp. 1061–1062; see also *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.)

"The standard is not whether the [reunification] services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547; see also *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 793–794.)

The appellant bears the burden to show that the juvenile court's finding is not supported by substantial evidence. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) In determining whether substantial evidence supports a finding, reviewing courts do not reweigh the evidence or substitute their judgment for that of the juvenile court. (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1166.) "Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile

28

court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*L.Y.L.*, at p. 947.)

C. *Analysis*

Regarding the threshold issue of forfeiture, we are not persuaded by the department's contention that parents forfeited their current appellate challenge to the juvenile court's reunification services finding.

"[A]s a general rule, failure to object in the juvenile court forfeits a parent's right to pursue an issue on appeal." (*In re S.F.* (2023) 91 Cal.App.5th 696, 724.) However, "[t]he contention that a judgment is not supported by substantial evidence . . . is an obvious exception to the rule." (*Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17; see also *In re K.F.* (2009) 173 Cal.App.4th 655, 660–661.) Thus, a parent may claim on appeal that there is insufficient evidence to support a mandatory finding (such as whether reasonable reunification services were provided) regardless of a parent's failure to object on that ground in the juvenile court. (See *In re Javier G.* (2006) 137 Cal.App.4th 453, 464 ["[W]hen the merits of a case are contested, a parent is not required to object to the agency's failure to carry its burden of proof."]; see also *In re Cole L.* (2021) 70 Cal.App.5th 591, 605, fn. 11.)

In the present case, parents requested a contested hearing on the department's recommendation of continued family reunification services and asked the juvenile court to return child to the family's home. On appeal, parents contend there is no substantial evidence showing that the department provided reasonable visitation which, in turn, amounts to a lack of substantial evidence to support the court's reunification services finding. Although parents did not argue in the juvenile court that the department failed to provide reasonable visitation and only specifically requested in-

29

person visitation starting on August 19, under the well-established exception governing sufficiency of the evidence claims, we decide that parents may raise their current claim that the department failed to satisfy its burden of proof regarding the provision of reunification services.

Turning to whether substantial evidence supports the juvenile court's reunification services finding, mother contends the department did not "satisfy the clear and convincing standard for reasonable services," because the department "relocated [child] two hours away and then ceded whether visits occurred to a highly dysregulated, emotionally and behaviorally unwell, 10-year-old, while placing the entire four-hour travel burden on the parents, resulting in no in-person contact for at least six weeks before the hearing." Mother similarly asserts, "The [d]epartment ignored the orders for visitation allowing the minor to dictate no visits, placing her in a different county, and then placing the entire burden on the parents to visit, which would have required four hours of driving each visit."

We are not persuaded that the juvenile court's reunification services finding as related to visitation lacks supporting substantial evidence. The record demonstrates that during the reunification period, child experienced extreme dysregulation and instability resulting in, among other things, three unsuccessful placements, multiple psychiatric holds, a 10-day psychiatric hospitalization, and difficulties in school. Child's myriad challenges affected the provision of visitation opportunities to the family, and child often refused to visit with parents.

The department openly acknowledged the difficulties with visitation and consistently attempted to address them. As detailed *ante* (see pt. I.D.), the department (in conjunction with the entire care team) sought to remediate the extant difficulties by actively encouraging child to visit with

parents (both in person and by video), arranging and encouraging therapeutic visitation from May through July to "strengthen the family's relationship during visits," and developing alternative methods of communication between child and parents, including letters and journaling.

Under the present circumstances, the department's remediation amounts to a reasonable effort to ensure that visitation would occur without detriment to child, while not allowing child to dictate whether parents would have the opportunity to visit. (See *Sofia M.*, *supra*, 24 Cal.App.5th at p. 1047 [if reasonable efforts are exhausted and "the child simply cannot be persuaded to visit, that, in and of itself, is not a basis for reversal"]; see also *In re Julie M.* (1999) 69 Cal.App.4th 41, 47–48.)

Regarding the department's decision to place child in Sacramento County (beginning on July 19), the record shows that the department exhaustively sought a suitable local placement before relocating child outside Santa Clara County. The department's efforts to place child locally failed because child's psychological and behavioral challenges were extreme and her needs complex. Between February and May, child experienced multiple psychiatric holds and three unsuccessful local foster placements (which offered different levels of care). In response to these placement failures, the department identified the Folsom small family home as a viable option. Social worker Ruano explained in her report that the Folsom home "is not only the highest level of care that could be found for [child] that was willing to accept placement of her, but that it was also the closest in proximity." Given the challenging circumstances in this case, the department's out-of-county placement decision is reasonable and supported by substantial evidence demonstrating that child needed a specialized environment—

31

otherwise unavailable proximate to San Jose—to achieve greater stability in her functioning.

Regarding the department's request that parents travel to Sacramento County for in-person visitation, Ruano explained that child struggles during car rides. Furthermore, although child continued to exhibit some behavioral issues (particularly at school) after her move to Folsom, according to Ruano's addendum report and hearing testimony, child achieved a level of stability in the small family home that she previously lacked during the reunification period. Under these circumstances, the department and juvenile court could have concluded that requiring parents to travel to Sacramento County for in-person visits was not unreasonable. The department and court could reasonably have determined that child's progress toward greater emotional and behavioral stability would be adversely affected by extended car travel and that such travel would be contrary to child's best interest.

The evidence additionally shows that the department made efforts to accommodate parents' preference against travel by offering and facilitating video visits from child's Folsom placement. Ruano testified that the video visits occurring after child moved to Folsom were similar in length to child's prior in-person visits with parents. Moreover, father testified that, from his perspective, the three or four recent video visits were, in general, "good visits." In addition, at the time of the hearing, the department was in the process of connecting child to mental health services in Sacramento County, and Ruano explained that she would work to set up and offer in-person therapeutic visitation. Hence, the evidence demonstrates that the department diligently attempted to offer visitation to parents that accorded with the juvenile court's visitation orders and the discretion the court provided to the department.

32

We are not persuaded by mother's reliance on *Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60 as support for her appellate claim of error.  In *Christopher D.*, the juvenile court had ordered weekly visitation with the father while he was in a residential treatment facility.  The social worker, however, provided only two visits over approximately three months, claiming that she was too busy to travel the necessary distance to facilitate the ordered visitation.  (*Id.* at pp. 73–74.)  The Court of Appeal decided that substantial evidence did not support the juvenile court's finding that reasonable services had been provided because the social services agency had not made reasonable efforts at arranging visits:  "The social worker's excuses of being *too busy* and [the father]'s drug rehabilitation center being *too far* simply do not provide substantial evidence that the Agency exercised a good faith effort to provide the visitation services ordered by the court."  (*Id.* at p. 74.)

In contrast to *Christopher D.*, in the instant matter, the remote placement and travel burden were born of and tethered to the child's instability and complex needs, not the department's workload or convenience.  Additionally, the department endeavored to ensure that video visits (at least) would continue to occur after child's relocation.

Likewise, mother's reliance on *In re Precious J.* (1996) 42 Cal.App.4th 1463 is unavailing.  In that case, the appellate court emphasized that there was "no evidence" the department facilitated even a single visit during the several months that the mother was incarcerated.  (*Id.*, at pp. 1477–1478, 1480.)  The Court of Appeal further stated:  "The Department implicitly concedes that it did not facilitate visitation in this case by refusing to acknowledge responsibility for providing such a service."  (*Id.* at p. 1478.)  In contrast, in the present case, the department did not shirk its obligation to

facilitate visitation and parents continued to have video visits with child after she was placed in Sacramento County.

We recognize that parents love child and have made sincere efforts to reunify with her in the face of child's significant challenges. We also recognize that there were positive elements of parents' interactions with child following her removal. However, the juvenile court chose to weigh those elements less heavily than parents believe they merited. That weighing decision does not render the court's ruling unsupported by the evidence or an abuse of discretion.

Considering the entire record in the light most favorable to the juvenile court's order, we conclude there is substantial evidence upon which a reasonable fact finder could find, under the clear and convincing evidence standard, that the department provided parents with reasonable reunification services related to visitation. (See *A.O.*, *supra*, 111 Cal.App.5th at pp. 1061–1062.)

## III.  DISPOSITION

The juvenile court's September 11, 2025 order is affirmed.

_____

Danner, J.

WE CONCUR:

_____

Greenwood, P. J.

_____

Grover, J.

**H053696**

*In re S.S.; Santa Clara County DFCS v. D.S. et al.*